GOTHARD, Judge.
This case arises from an ongoing dispute between the divorced parents of a young child over the father’s visitation rights. The mother appeals a judgment allowing overnight visitation.
Suzanne Haase and Richard de la Hous-saye were married on December 31, 1982. Their son, Richard Antoine (Rick) de la Houssaye, was born on September 30, 1983. The parents separated physically within weeks of Rick’s birth. Mrs. de la Houssaye filed for separation in April, 1984 and judgment was signed on March 28, 1985, granting Mrs. de la Houssaye a separation and custody of Rick. (We note that judgment was read and rendered on September 25, 1984.) The continuing dispute began before Rick was a year old and has involved considerable litigation, along with evaluations by several mental health professionals.
The case is before this court now on the issue of a judgment rendered June 30, 1988, changing the previous visitation schedule by increasing the father’s visitation time and ordering overnight weekend visits to begin in September, 1988. Mrs. de la Houssaye appealed on June 30, 1988. On July 1 she applied to this court for a writ of review and stay order, which was granted on July 6. On July 28 the court ordered that the writ application be consolidated with the appeal and that the matter receive an expedited hearing, with the stay to remain in effect during the pendency of the appeal. Mr. de la Houssaye’s motion to revoke the stay order was denied on July 13, 1988.[1]
The sole issue is whether or not the trial judge acted in the best interest of the child or whether the judgment represents an abuse of discretion.
A summary of the fundamental rules in child visitation appears in Edelen v. Edelen, 457 So.2d 171, 175 (La.App. 2nd Cir.1984), as follows:
*595 ... (1) the paramount consideration in determining visitation rights is the best interest of the child; and (2) the trial court has great discretion in the area and his determination will not be disturbed on appeal in the absence of manifest error. Furthermore, each individual case is dependent upon its own facts. Johnson v. Johnson, supra, [357 So.2d 69 (La.App. 4th Cir.1978)]; Vinet v. Vinet, 184 So.2d 33 (La.App. 4th Cir.1966).
The court in Johnson v. Johnson, supra, adds, at 72:
... If an exercise of the visitation rights awarded by the trial court is deemed to be injurious to the child’s welfare upon appellate review, the Court of Appeal will reverse the trial court’s award_ [Citations omitted.]
Prior to the judgment of June 30, 1988 the visitation schedule had been set out or altered in some five judgments, including the divorce judgment. Each time the father had asked for overnight visitation (as early as April, 1985 when Rick was eighteen months old), which Mrs. de la Hous-saye vehemently opposed and, presumably, opposes to this day. We note that a complicating factor in resolving visitation problems is that Mr. de la Houssaye works and lives in Baton Rouge, while Mrs. de la Houssaye lives in Jefferson, so that frequent brief contacts between father and child have not been feasible.
Mrs. de la Houssaye alleged in her petition for separation that her ex-husband drank to excess, had a violent, uncontrollable temper and had at times physically abused her. In the judgment of June 22, 1984 on the rule for alimony and child support, etc., the court required that an adult agreeable to Mrs. de la Houssaye must go with the father on visitation and must drive the car. This requirement is contained also in a judgment signed on July 1, 1985. In March, 1987 Mr. de la Hous-saye entered the East Baton Rouge Parish Chemical Dependency Unit and after a thirty-day inpatient period has continued with the prescribed program of aftercare, including attendance at Alcoholics Anonymous meetings.
Mrs. de la Houssaye testified in the hearing of June 24, 1988 as to her feelings toward Mr. de la Houssaye. She stated that she disliked him, distrusted him, and found him cold and callous in dealing with Rick. She has been unable to discuss anything with Mr. de la Houssaye regarding the child. She stated that as long as the daytime visitations do not hurt Rick she will not oppose them, as she feels the boy can handle them. But she has opposed the overnight visits because the father has told the child he will spend the night. She said:
... And Rick has gone to bed crying, “Please don’t let it happen.” He has also told me on numerous occasions that he is terribly afraid of it, that he doesn’t like his father, he doesn’t like the visits and he doesn’t understand why he has to go.”
Mrs. de la Houssaye denied hampering the visitation, but stated that Rick did not want to go:
... He fights them with everything that’s in him. And I’m the one who has to drag him kicking and screaming out the door to go with his father.
She stated that the child’s behavior is affected by these episodes, in that after he returns he throws tantrums, is resistant, and has told her he was mad because she made him go with his daddy. During periods when the visits have not taken place, Rick is a much more relaxed child and easier to get along with.
The father was not present at the June 24 hearing because of realistic employment responsibilities; consequently, we have only the testimony of others as to his relationship with the child. We may surmise from his continued pressure through the courts to have overnight visits that he is determined to achieve his goal and is unwilling or unable to communicate and/or compromise with his former wife. As to the father’s alcoholism, Dr. Camilla Cowar-din, psychiatrist, testified that he admitted to her in 1988 that had Mrs. de la Houssaye not prevented overnight visits earlier on, he would have consumed alcohol when the child was present. Louis Gibson, director of the State Alcohol and Drug Abuse Treatment Center, Mary Levingston, after *596 care coordinator of the Chemical Dependency Unit, and Bill Hite, a counselor in the CDU, testified that Mr. de la Houssaye was attending the required meetings and they felt that his alcoholism should not be an impediment to overnight visitation with his child. They had no reports of his failing to remain sober for a year. His current wife is not an alcoholic but does take part in the program as a family member. When reporting on the father-child relationships, the mental health experts who observed Rick with Mr. de la Houssaye testified that once he separated from the mother the child and father played together normally, although one observer felt that the father had to initiate the interaction rather than its coming from Rick.
A number of professionals have been appointed by the court or consulted by the parents on the order of the court in an effort to resolve the visitation problem, beginning in 1985. The parents were referred to mediation in 1986, which failed. The mother consulted Dr. Camilla Cowar-din, a child psychiatrist, in March, 1985. The court appointed Dr. Cowardin to evaluate the situation in January, 1987 and again in April, 1988. Philip Bein, a clinical social worker in private practice, was appointed to evaluate the parents, Rick, and the parent-child relationship in 1988. Dr. Carmen Ramos, a child psychiatrist, saw Rick with his father and mother separately in 1988 at the request of Mr. Bein. At the father’s request the court ordered a team at the West Bank Parenting Center to evaluate the family in 1987 and in 1988. Dr. Barbara Hardin, psychologist, administered psychological tests to the parents and observed the child with each parent in March, 1987, while Gregory Harris, a social worker, interviewed the parents and observed Rick with the parents separately in 1987 and 1988. All these experts testified in the June hearings.
Dr. Hardin testified that in March, 1987 she felt the mother was overly attached to her son to the extent that she could not tolerate seeing him experience even small amounts of normal distress. The child was reluctant to leave her but once he and the father were alone in the playroom he showed no anxiety and played comfortably with the father. He then showed distress when it was time to leave the father. From her observation of parent and child and the father’s test profile she saw no indication that Rick should not visit overnight. Gregory Harris felt the child should be allowed to visit his father overnight from Friday to Sunday. He testified that the mother was causing him to be insecure and overdependent. He felt that it was in the child’s best interest to learn to cope with stressful situations independently and that it was detrimental to his development to deny the overnight stays. We note that each Dr. Hardin and Mr. Harris saw the family members separately and together for one appointment only in 1987, while Mr. Harris saw them for one appointment again in 1988.
Philip Bein appears to have had eight appointments with the de la Houssayes separately and with Rick. He felt that Mr. de la Houssaye was an adequate father and that there was a bond between father and son. Mr. Bein and Rick chatted about the reason for Rick’s visit. When Mr. Bein asked Rick if he thought he could handle an overnight visit he said, “No,” but when asked when he would be able to do so he replied, “When I’m five.” While Mr. Bein felt that the separation anxiety was partly due to Mrs. de la Houssaye’s extreme involvement with her child and her struggle with her ex-husband, he stated that at that time it would not be in the child’s best interest to compel him to visit overnight. He recommended joint counseling related to the divorce and psychotherapy for the mother. He predicted that at age five Rick’s separation anxiety would still be present but believed the visits should be started. Dr. Ramos saw Rick with each parent once in March, 1988 and felt that he was not ready for overnight stays then, because of his developmental age, his separation anxiety disorder, and the conflict between the parents that was impeding resolution of the anxiety. She felt that forcing the visits would exacerbate Rick’s disorder and would not promote his forming a relationship with his father.
*597 Dr. Cowardin had seen the mother and child several times between March and May, 1985, when Rick had been having problems with being removed from his mother to visit the father over a period of several months. Dr. Cowardin said that the child’s changes in behavior were to be expected when he, then such a young child, was removed to a very difficult visitation situation and felt the mother’s concern was valid. In January, 1987 she considered that the child, then three, was not ready for the stress of being away overnight. However, the daytime visits were going better and just when she thought the father was beginning to show more understanding, he went to court again to seek overnight visitation. She felt that he was making a legitimate effort to establish a positive relationship with Rick, but was unable to accept any point of view except his own. In April, 1988, Dr. Cowardin again recommended against the overnight visits. She explained that not all five-year-olds are comfortable spending the night away from their mothers. With Rick and his father, the situation has not been one in which he could develop trust and a parent-child relationship. She felt that psychologically it was impossible for a trusting relationship to have developed with occasional visits, particularly considering the nature of the visits in this case. Rick is unprepared at this point for visits overnight because he has not even done so with friends or relatives.
Both Dr. Ramos and Dr. Cowardin were asked for their recommendations. Dr. Ramos said she felt the child needed a relationship with the father. When asked how best the father could form a relationship with his son, she replied:
Continue involvement with the child as much as possible. And for the mother and father to work out their differences. Because what happens is if the child doesn’t trust that the father can take care of him well, he’s going to have a fear of going with him. I think that he needs to feel that his mother feels okay about his going with his father for the anxiety level to decrease. And therefore, mother and father need to work on building up some trust with each other and working out their differences so that the child can do this.
Dr. Cowardin said:
What I would recommend at this time is that the Court give the mother a litigation free period during which she can make her own endeavor to ready the child for overnight visits.
I do not think that overnight visits should be forced ideally ever. But I think that they definitely should not be ordered until the child has had the first semester of formal schooling, which will start this September. Because this will be critical for his development how he— what his initial experience in school is. And if he is stressed by being forced to have overnight visits in a situation that he does not trust, the likelihood is that he’s going to develop a school refusal syndrom.(sic)
That’s a situation which children refuse to go to school because of their complicated set of feelings about the person who is taking care of them.
The difficulty with forcing a child to do something that they don’t feel — that threatens them because they don’t trust the situation is that the person who forces them gets blamed for it, and that is always the primary caretaker, because children of this age can’t possibly understand about court. So that it provokes rage in the child. And then in the child it provokes the fear that their rage is going to destroy this person on whom they’re dependent. And it is very difficult to handle if you have an ongoing situation that is constantly provoking it. So I would recommend that she be allowed to get him started in school. And that the mother be allowed to handle this her own way for say four months, six months or something like that. But that both parents be required to work with a counsel- or to try to help them increase their communication, not about everything, but specifically about the visitation. At this point, they really can’t talk to one another.
*598 Because of the stay order issued by this court on July 6, 1988, the mother has, in fact, had a litigation free period in which to handle the problem. Five months have also elapsed since the child has started school. The visitation schedule set out in the judgment of June 30, 1988 reads as follows, in pertinent part:
1. Forthwith, each weekend on Saturday from 9:00 A.M. until 7:00 P.M. and on each Wednesday from 5:00 P.M. until 8:00 P.M.;
2. Daily, from July 11, 1988 until July 15, 1988, both inclusive, from 9:00 A.M. until 8:00 P.M.;
3. Daily, from July 25, 1988 until July 29, 1988, both inclusive, from 9:00 A.M. until 8:00 P.M.;
4. Daily, from August 15, 1988 until August 19,1988, both inclusive, from 9:00 A.M. until 8:00 P.M.;
5. In September, on Saturday, overnight on each and every weekend from 9:00 A.M. Saturday to 6:00 P.M. Sunday;
6. In the month of October, and thereafter, pending further orders of the Court, each and every weekend from Friday at 5:00 P.M. until Sunday at 6:00 P.M. [Emphasis supplied.]
The balance of the schedule concerns summer and holiday visits through the year 1991. While we consider that moving from one night away from home to two nights in one month may be too rapid a change for Rick, we note that the judgment requires a court order for the change to be made. Accordingly, we do not find that the visitation schedule set out in the judgment was an abuse of discretion. However, because the judgment was stayed, the gradual increase in time spent with the father has not taken place and the schedule is not appropriate at this point. For that reason we vacate the judgment.
Presumably the parents have followed the schedule prescribed by the November 17, 1987 consent judgment, which was essentially twice a week, on Wednesdays from 6:00 p.m. until 8:00 p.m. and on alternating Saturdays and Sundays, from 9:00 a.m. until 5:00 p.m.; on three of every four weekend visits the father could take the child to Baton Rouge.
At this time Rick will have completed the first semester of kindergarten and Mrs. de la Houssaye has had time to prepare him for overnight stays. If the parents have made some progress in communicating with each other and if Rick has had some satisfactory experiences visiting overnight in town, he should be ready to begin spending the night in Baton Rouge. Accordingly, we remand to the trial court for the purpose of an evidentiary hearing, on the basis of which the judge may determine whether the November 17,1987 schedule of daytime visits shall remain in effect or else order a new schedule.
We feel compelled to say that the continuing disagreement and litigation during this youngster’s life cause us great concern for his emotional development. The three district judges who have rendered visitation judgments in this matter have obviously given sensitive and thoughtful consideration to the visitation dilemma and have sought competent professional consultation in attempting to set an appropriate schedule. They have put the child’s best interest above other considerations. Our reading of the history suggests that although each parent loves the child, neither is acting in the child’s best interest. Instead, they are continuing their conflict into the child’s life and making him the victim. We find little to suggest that either parent has been willing to compromise or work with the other to utilize the recommendations that have been made to them by professionals. The experts were unanimous in testifying that the child’s best interest would be better served by the parents’ cooperation in planning for him than by their continuing to battle in the courts.
JUDGMENT VACATED, CASE REMANDED.

. The parties have been before this court previously on application for writ of review and stay order, 85-C-409, filed on July 9, 1985, and on appeal, de la Houssaye v. de la Houssaye, 85-CA-625, March 10, 1986 (unpublished appeal), vacated and set aside, 489 So.2d 234 (La.1986).